PHIL BREDESEN, Governor of the )
State of Tennessee,            )
                               )
      Plaintiff,               )
                               )
v.                             )
                               )
DONALD H. RUMSFELD, Secretary  )    No. 3:05-0640
of Defense of the United States, )  JUDGE ECHOLS
ANTHONY J. PRINCIPI, Chairman  )
of the Defense Base Closure and )
Realignment Commission; JAMES H. )
BILBRAY; PHILLIP E. COYLE,     )
HAROLD W. GEHMAN, JR.; JAMES V. )
HANSEN; JAMES T. HILL; LLOYD W. )
NEWTON; SAMUEL K. SKINNER; and )
SUE ELLEN TURNER, members of   )
the Defense Base Closure and   )
Realignment Commission,        )
                               )
      Defendants.              )

## <u>MEMORANDUM</u>

Phil Bredesen, Governor of the State of Tennessee ("the Governor") filed a Motion For a Temporary Restraining Order (Docket Entry No. 19), to which Defendants responded in opposition. Defendants are Donald H. Rumsfeld, Secretary of Defense of the United States, Anthony Principi, Chairman of the Defense Base Closure and Realignment Commission ("the Commission"), and James H. Bilbray, Phillip E. Coyle, Harold W. Gehman, Jr., James W. Hansen, James T. Hill, Lloyd W. Newton, Samuel K. Skinner, and Sue Ellen Turner, members of the Commission.

1

The Court granted leave for United States Representatives Jim Cooper, Lincoln Davis, Bart Gordon, Harold Ford, Jr., and John Tanner to participate as amici curiae. The Court also granted leave for Tennessee State Senators Thelma Harper, Joe Haynes, Douglas Henry and Rosalind Kurita and Tennessee State Representatives Stratton Bone, Rob Briley, Kent Coleman, Eugene Davidson, John Hood, Sherry Jones, Edith Taylor Langster, Kim McMillan, Gary Moore, Gary Odom, Janis Baird Sontany, Mike Turner & Ben West, Jr. to participate as amici curiae.

This matter arises from the attempt by the United States Department of Defense to realign the 118th Airlift Wing of the Tennessee Air National Guard by moving eight (8) C130 H2 transport aircraft to Air National Guard units in Louisville, Kentucky, and Peoria, Illinois, and by moving the Aero Medical Evacuation Squadron to Carswell Air Force Base in Texas without the consent of the Governor, as required under 32 U.S.C. § 104.[1] [2] The Governor

---

[1]32 U.S.C. § 104(c) provides as follows:

To secure a force of units of which when combined will form complete higher tactical units, the President may designate the units of the National Guard, by branch of the Army or organization of the Air Force, to be maintained in each State and Territory, Puerto Rico, and the District of Columbia. However, no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor.

[2]The Court recognizes that the Governor also asserts his consent is required under 10 U.S.C. § 18328. Because there is some legal question whether the statute applies in this context, _see_

2

seeks a declaratory judgment under 28 U.S.C. §§ 2201 & 2202 that Secretary Rumsfeld exceeded his statutory authority under the Defense Base Closure and Realignment Act of 1990, as amended, 10 U.S.C. § 2687 note ("the BRAC Act") by inappropriately relying on the Act to relocate, withdraw, disband or change the organization of the Tennessee Air National Guard without gubernatorial consent. The Governor also seeks a declaratory judgment that the proposed realignment of the 118th Airlift Wing would result in interference with the use of the Nashville International Airport Air Guard Station for the training and administration of reserve components of the armed forces, in violation of 10 U.S.C. § 18235(b)(1).

## I.  FACTS AND PROCEDURAL HISTORY

On August 18, 2005, the Governor filed a Complaint against the Defendants alleging that, pursuant to sections 2903 and 2914 of the BRAC Act, the Commission is empowered to consider the recommendations of the Secretary of Defense and make recommendations to the President of the United States for the closure and realignment of military installations.  Pursuant to sections 2903 and 2904 of the BRAC Act, the Secretary of Defense shall close or realign military installations as recommended by the Commission unless the recommendation of the Commission is rejected

---

Rendell v. Rumsfeld, No. 05-3563, 2005 WL 2050295 at *20-21 (E.D. Penn. Aug. 26, 2005), and because the parties have not had the opportunity to brief the issue fully on short notice in preparation of the TRO hearing, the Court will not discuss the implications of the statute in this opinion.

3

by the President or disapproved by a joint resolution of Congress. The purpose of the BRAC Act is to close or realign military installations that create an unnecessary drain on the economic resources of the Department of Defense. The BRAC Act creates criteria for use in identifying military installations for closure or realignment. Under Section 2910, "realignment" is defined by the Act to include "any action which both reduces and relocates functions and civilian personnel positions but does not include a reduction in force resulting from workload adjustments, reduced personnel or funding levels, or skill imbalances."

On May 13, 2005, Secretary Rumsfeld recommended to the Commission the realignment of the Tennessee Air National Guard's 118th Airlift Wing. The 118th Airlift Wing is an operational flying National Guard Unit located entirely within the State of Tennessee at the Nashville International Airport Air Guard Station in Nashville, Tennessee. The Tennessee Air National Guard constitutes a portion of the reserve component of the armed forces of the United States. "The National Guard is the modern Militia reserved to the States by Art. I, s 8, cl. 15, 16 of the Constitution." Maryland ex rel. Levin v. United States, 381 U.S. 41, 46 (1965), vacated on other grounds, 382 U.S. 159 (1965), quoted in Rendell v. Rumsfeld, No. 05-3563, 2005 WL 2050295 at *2 (E.D. Penn. Aug. 26, 2005). The National Guard was established in each of the states with a dual responsibility to serve as state militias of the

4

respective states and as a part of the federal armed forces, when units of the National Guard are called into federal service. The Air National Guard base at the Nashville International Airport Air Guard Station is used for the administration and training of the air reserve component of the armed forces.

There are currently one thousand two hundred twenty-seven (1,227) military and civilian positions allotted to the 118th Airlift Wing, which includes sixty-five (65) Active Guard and Reserve personnel, two hundred twenty-six (226) military technicians, and nine hundred thirty-six (936) part-time Guard members. In addition to the loss of eight C 120 H2 aircraft, the Secretary's original recommendation to realign the 118th Airlift Wing would result in the loss of seven hundred two (702) total personnel from the Tennessee Air National Guard, consisting of nineteen (19) Active Guard and Reserve, one hundred seventy-two (172) military technicians, and five hundred eleven (511) traditional part-time Guard positions.

According to the Governor, the realignment would deprive the Governor of one of his most valuable assets. As Commander in Chief of the Tennessee National Guard, the Governor has the authority through his appointed representative, the Adjutant General, who acts as commander of the military department of Tennessee, to direct military airlift teams of the 118th Airlift Wing from Nashville to other areas of the state or outside the state to

5

perform duties or assist in the performance of a wide variety of missions to directly benefit the citizens of Tennessee and other areas. For instance, the C 130 H aircraft and crews can be used to transport personnel, equipment and materials to assist in all types of disasters, such a tornadoes, floods, earthquakes, forest fires, prison riots, urban disturbances, industrial accidents, train wrecks, chemical, nuclear or biological accidents, or terrorist attacks. Removal of these valuable aircraft, their crews, and support personnel would dramatically limit the Governor's ability to protect Tennessee citizens and perform vital state missions and would make Tennessee vulnerable in its ability to respond to a disaster or terrorist attack and would severely affect Tennessee's Homeland Security. The Aero Medical Evacuation Squadron of the 118th comprises the only deployable medical capability in the Tennessee Air National Guard. Its transfer to Carswell Air Force Base in Texas would immediately eliminate the Governor's option to use this versatile medical unit for the benefit of the citizens of Tennessee and other areas and it severely reduces Tennessee's Homeland Security response capabilities.

The 118th Airlift Wing plays a key role in disaster and emergency response and recovery in Tennessee, particularly with regard to planning for potential major earthquake activity along the New Madrid Fault which runs from Memphis through West Tennessee to the outskirts of Nashville. The Air National Guard Base in

6

Nashville is key to the emergency response capabilities of the Tennessee Emergency Management Agency ("TEMA") and is central to the five (5) Federal Emergency Management ("FEMA") regions. The medical evacuation squadron also is a major asset for use by the Governor under the Emergency Management Assistance Compact between the governors of all fifty states, which has been ratified by Congress. Under the Compact governors call on other governors to provide assistance when faced with disasters and other emergency situations in their respective states.

During Operation Noble Eagle from September 11, 2001, until October 2002, the 118th Airlift Wing was one of only three such units selected to support critical Quick Reaction Force ("QRF") and Ready Reaction Force ("RRF") missions, and was identified as a first responder Airlift Support Wing in the event of a weapons of mass destruction ("WMD") emergency. Relocating the 118th Airlift Wing would deprive the Governor and the State of Tennessee of these critical Homeland Security assets.

The one thousand two hundred twenty-seven (1,227) positions assigned to the 118th Airlift Wing constitute a well-trained, mission ready state military force available to the Governor to perform State Active Duty Missions dealing with homeland security, natural disasters, and other State missions. Removal of the unit's aircraft changes the unit's organization and allotment and destroys its ability to perform the mission for which it was created.

7

Realignment would deprive the Governor of nearly one-third (1/3) of the total strength of the Tennessee Air National Guard and would substantially reduce the strength of military forces in the Middle Tennessee region. Realignment would deprive the Governor and the State of Tennessee of a key unit and joint base of operations possessing current and future military capabilities to address homeland security missions in Tennessee and the southeastern United States.

On May 13, 2005, Secretary Rumsfeld recommended the 118th Airlift Wing be realigned by moving four (4) of its C 130 H aircraft to Peoria, Illinois, and four (4) to Louisville, Kentucky, the Aeromedical Squadron to Fort Worth, Texas, and the aerial port and firefighters to Memphis, Tennessee. In May 2005 and at all times after Secretary Rumsfeld's transmittal of the BRAC Report to the Commission, an overwhelming majority of the members of the 118th Airlift Wing were not, and currently are not, in active federal service. At no time during the 2005 BRAC process did Secretary Rumsfeld or any authorized representative of the Department of Defense request or obtain the approval of the Governor or his authorized representatives to relocate or realign the 118th Airlift wing or to change the branch, organization or allotment[3] of the

---

[3] "Allotment" as used in 32 U.S.C. § 104, refers to annual federal support in appropriations and for military personnel and equipment designated for the National Guard unit. See Barnett v. United States, 174 F.Supp. 907, 910 (Ct. Cl. 1959) ("Federal recognition of the . . . National Guard depends upon the voluntary

8

118th Airlift Wing. If asked, the Governor would not give his approval to relocate, withdraw, deactivate, realign, or change the branch, organization or allotment of the 118th Airlift Wing. By letter dated August 5, 2005, the Governor notified Secretary Rumsfeld that he did not consent to the realignment, relocation or withdrawal of the 118th Airlift Wing. To date, the Governor has not received any response to his letter.

On Friday, August 26, 2005, the Commission voted to realign the 118th Airlift Wing. The Commission amended the language used by the Secretary in his initial realignment request but the eight C 130 aircraft would be reassigned to the locations recommended by the Secretary in order to "better support national security requirements in other locations[.]" The personnel of the 118th, however, would remain assigned to their duty station at the Nashville Airport Air Guard Station, but apparently without a

_____

fulfillment by the local unit of all prescribed regulations and requirements, and the allotment of Federally appropriated funds depends upon Federal recognition of the Territorial militia."); Hedden v. United States, 153 F.Supp. 459, 461 (Ct. Cl. 1957) ("the Secretary was authorized to pay out so much of the State's Federal militia allotment as was necessary for the payment, subsistence and transportation of these units engaged in actual field or camp service instruction."); Price v. United States, 100 F.Supp. 310, 312 (Ct. Cl. 1951) ("The Secretary was authorized to issue arms and equipment to the organized militia of a State on the requisition of the Governor without charging the cost to the State's allotment of the annual appropriation provided[.]").

9

mission, aircraft, or equipment.[4]   The Commission's recommendation

reads as follows:

### 110. *Nashville International Airport Air Guard Station, TN (AF 44)*

**a. Realign Nashville International Airport (IAP) Air Guard Station (AGS), TN.**

Distribute the 8 C-130 aircraft assigned to the 118th Airlift Wing (ANG) to meet the Primary Assigned Aircraft (PAA) requirements established by the Base Closure and Realignment recommendations of the Secretary of Defense, as amended by the Base Closure and Realignment Commission.

- Establish 8[5] PAA C-130 aircraft at the 182nd Airlift Wing (ANG), Greater Peoria Airport, AGS, Illinois.
- Establish 8 PAA C-130 aircraft at the 123rd Airlift Wing (ANG), Louisville International Airport Air Guard Station, Kentucky.

Establish a contiguous enclave for the 118th Airlift Wing (ANG) sufficient to support operations of those units, including flight operations, and compatible with joint use of the Nashville International Airport as a civilian airport.

If the State of Tennessee decides to change the organization, composition and location of the 118th Wing (ANG) to integrate the unit into the Future Total Force all personnel allotted to the 118th Wing (ANG) will remain in place and assume a mission relevant to the security interests of the State of Tennessee and consistent with the integration of the unit into the Future Total Force, including but not limited to air mobility, C4ISR, engineering, flight training or unmanned aerial vehicles. Where appropriate, unit personnel will be retrained in skills relevant to the emerging mission.

This recommendation does not effect a change to the authorized end-strength of the Tennessee Air National Guard. The distribution of aircraft currently assigned

---

[4]The Governor's challenge to original language used by the Secretary is thus moot.

[5]The two references in the recommendation to "8" aircraft appear to be erroneous, as a total of eight (8) aircraft are slated for transfer: four (4) to Kentucky and four (4) to Illinois.

Case 3:05-cv-00640   Document 41   Filed 09/07/05   Page 10 of 28 PageID #: 332

to the 118th Wing (ANG) is based upon a resource-constrained determination by the Department of Defense that the aircraft concerned will better support national security requirements in other locations and is not conditioned upon the agreement of the state.

In support of the Motion for a Temporary Restraining Order, the Governor supplied the Declaration of Major General Gus L. Hargett, Jr., Commissioner for the Department of Military and Adjutant General of the National Guard of the State of Tennessee. At the hearing held on Friday, September 2, 2005, in which the Defendants participated through counsel, General Hargett testified consistently with the facts outlined above. He described a number of civil relief and war-related missions previously completed by the 118th Airlift Wing and offered as an example the Governor's order last week that the State's C130 H2 aircraft be placed into service to fly troops, equipment, doctors, nurses, medical supplies and other materials to New Orleans, Louisiana, to provide humanitarian relief and to assist in the evacuation of a Veteran's Administration Hospital in the city due to the destruction and flooding caused by Hurricane Katrina. Additionally, he explained that loss of National Guard personnel in Tennessee as a result of the potential transfer of the C130 H2 aircraft to other states would be inevitable because the operations and maintenance personnel would move with the aircraft to keep their jobs. Air National Guard members can and will pursue positions with flying wings or aero medical squadrons in other states because this is

11

what they have been trained to do. Some members would be expected to leave service in the Air National Guard if their job positions are eliminated. Without the C130 H2 aircraft and members of the 118th Airlift Wing at his command, the Governor would be unable to use the valuable assets of the 118th to respond to future emergencies as he has done in the past. General Hargett has not yet received any orders directing transfer of the C130 H2 aircraft or the Aero Medical Evacuation Squadron to other locations.

## II. <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 65(b), the Court may grant a temporary restraining order ("TRO") if it clearly appears from specific facts shown by testimony, affidavits or a verified complaint that immediate and irreparable injury, loss or damage will result to the applicant. In deciding whether to grant a TRO, the Court must consider four factors: (1) whether the party seeking the TRO has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the TRO is not entered; (3) the potential harm the TRO would cause the opposing party; and (4) the public interest. <u>See</u> <u>Leary v. Daeschner</u>, 228 F.3d 729, 736 (6th Cir. 2000).

## III. <u>ANALYSIS</u>

### A. Standing and Ripeness

The Court will first consider the preliminary matters raised by Defendants that this controversy is not yet ripe for

adjudication and the Governor lacks Article III standing to seek injunctive relief because his alleged injuries are not certain or imminent. Ripeness is closely related to standing because each is a component of the Constitution's limitation of judicial power to the adjudication of real cases and controversies.

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998) (quoted cases omitted); <u>Ammex, Inc. v. Cox</u>, 351 F.3d 697, 706 (6th Cir. 2003). Issues concerning standing and ripeness arise "when litigants seek to enjoin the enforcement of statutes, regulations, or policies that have not yet been enforced against them." <u>Ammex, Inc.</u>, 351 F.3d at 706. Because the Governor seeks declaratory and injunctive relief in this action, he may make "a pre-enforcement challenge . . . before the actual completion of an injury in fact." <u>Grendell v. Ohio Supreme Court</u>, 252 F.3d 828, 832 (6th Cir. 2001) (citing <u>National Rifle Assoc. v. Magaw</u>, 132 F.3d 272, 279 (6th Cir. 1997)); <u>Peoples Rights Org., Inc. v. City of Columbus</u>, 152 F.3d 522, 527 (6th Cir. 1998). However, the Governor must show "'actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review.'" <u>Id.</u> The Governor "does not have to await the consummation of threatened injury to obtain preventive relief. Rather, if the injury is certainly impending, that is sufficient." <u>Peoples Rights Org., Inc.</u>, 152 F.3d at 572 (citing <u>Babbitt v.</u>

United Farm Workers Union, 442 U.S. 289, 298 (1979)).

Defendants suggest this case is not ripe for adjudication and the Governor lacks standing to mount this challenge because the Commission's vote to recommend the relocation of the 118th aircraft rests on contingencies yet to occur in the future. Section 2912(d)1) of the BRAC Act requires the Commission to submit its report to the President not later than Thursday, September 8, 2005. In accordance with section 2912(e)(1), the President is then required to prepare a report, no later than September 23, 2005, containing the President's approval or disapproval of the Commission's recommendations. If the President disapproves the report, section 2912(e)(2) allows the Commission until October 20, 2005, to transmit a revised recommendation to the President. If the President does not submit to Congress an approval and certification of the Commission's report by November 7, 2005, the process by which military installations are closed or realigned will be terminated for 2005. If, however, the President submits to Congress his approval and certification of the Commission's report, the report will become final unless Congress disapproves by joint resolution. Defendants contend the BRAC process is not yet finalized and the Court's intervention at this point is unwarranted because the harm the Governor fears may ultimately never come to pass.

14

The Court recognizes that the ripeness requirement is "designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" National Park Hospitality Ass'n v. Department of Interior, 538 U.S. 803, 807-808 (2003) (quoted case omitted). The Court is equally aware of the Supreme Court's admonitions in Franklin v. Massachusetts, 505 U.S. 788, 796-801 (1992) and Dalton v. Specter, 511 U.S. 462, 468-469 (1994), that non-final agency action is not subject to review under the Administrative Procedures Act ("APA").

In Dalton, the Supreme Court rejected a challenge under the APA to the closing of the Philadelphia Naval Shipyard pursuant to the BRAC Act because the "reports submitted by the Secretary and the Commission . . . 'carr[y] no direct consequences' for base closings." 511 U.S. at 469. The Supreme Court stated the "action that 'will directly affect' the military bases, . . . is taken by the President, when he submits his certification of approval to Congress." Id. at 469, 470. In Part II of Dalton, the Supreme Court precluded judicial review under the APA of the President's discretionary decision to accept the Commission's recommendation to close the shipyard, id. at 476, noting "longstanding authority

15

holds that such review is not available when the statute in question commits the decision to the discretion of the President." <u>Id.</u> at 474.

The Supreme Court nonetheless observed that "[w]e may assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA[,]" citing <u>Dames & Moore v. Regan</u>, 453 U.S. 654 (1981). <u>Id.</u> at 474. Because the plaintiffs in that action did not raise a constitutional claim, but raised only a statutory claim that the President exceeded his authority under the 1990 BRAC Act, the Supreme Court concluded judicial review of the President's decision under the APA was not available. <u>Id.</u> at 476-477.

This case can be distinguished from <u>Dalton</u> in that the Governor raises a constitutional claim that the decisions of the Secretary and the Commission violate Article I, § 8, clauses 15 and 16 and the Second Amendment of the United States Constitution.[6] Further, the Governor raises a claim that Secretary Rumsfeld

_____

[6]Under Article I, § 8, clauses 15 and 16, Congress "shall have the power "[t]o provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions[]" and "[t]o provide for organizing, arming, and disciplining, the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress[.]"

The Second Amendment reads: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."

16

violated federal law when he failed to seek the Governor's consent to realign the 118th Airlift Wing, as required by 32 U.S.C. § 104. The Governor has standing to raise these constitutional and statutory claims even though he lacks, and does not seek, standing to pursue judicial review of the realignment decision under the APA.  See National Fed. of Federal Employees v. United States, 905 F.2d 400, 402-404 (D.C. Cir. 1990).

The Court finds the Governor, as Commander in Chief of the Tennessee Air National Guard, meets the requirements of Article III standing because he establishes "'that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' . . . and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'"  Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 472 (1982) (quoted cases omitted).  The Governor will lose his statutory right to approve or disapprove of the change in the branch, organization or allotment of the 118th Airlift Wing if he does not seek relief at this juncture, as the decisions of the Secretary and the Commission have nullified his statutory authority.  32 U.S.C. § 104; Rendell v. Rumsfeld, No. 05-3563, 2005 WL 2050295 at *8-10 (E.D. Penn. Aug. 26, 2005).

Moreover, the Court finds the controversy is ripe for adjudication because the Commission has taken its final action on

the Secretary's recommendation to realign the 118th Airlift Wing. Rendell, 2005 WL 2050295 at *13. The Commission's ministerial act of transmitting its report to the President is imminent. Thus, the Governor properly seeks injunctive relief at this stage because his constitutional and statutory claims against the Secretary and the Commission will not arise in any more concrete or final form. See Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2nd Cir. 2005). Moreover, the Governor must seek injunctive relief at this time to avoid any future contention by Defendants that Dalton bars the Governor from obtaining judicial review of the realignment decision after the recommendation is submitted to the President. See Rendell, 2005 WL 2050295 at *12.

Accordingly, the Court concludes that the matter is ripe for adjudication and that the Governor has Article III standing to pursue declaratory and injunctive relief.

**B. The Motion for Temporary Restraining Order**

*1. Likelihood of success on the merits*

At the time the United States Constitution was drafted, the Framers feared standing armies. Perpich v. Department of Defense, 496 U.S. 334, 340 (1990). Their fear, however, was tempered by the realization that the country's defense could not be left solely to state militias. In reconciling these competing concerns, the Framers compromised by establishing a standing army while

18

protecting the existence of state militias in Article I, § 8, cl. 15 & 16 and in the Second Amendment.

Many years later, in 1933, Congress passed the National Guard Organization Act, which amended the National Defense Act of 1916. The Act divided the organized militia into "two overlapping but distinct organizations," the National Guard of the United States, as a component of the Army of the United States, both in time of peace and in war, and the State National Guard, which reserved to the states their right to control the National Guard as the organized militia under the militia clause of the Constitution in time of peace. Id. at 343-45. Thus, the National Guard maintains a dual enlistment system to preserve the dual roles of the organization. Id. Under the system, National Guard members enlist simultaneously into their state militia unit and the Reserve Component of the Army or Air National Guard of the United States. Id. at 347 n.19. While the National Guard can be called into federal service, it is a state militia when not called to active federal duty. It is controlled by the State and the Governor is the Commander in Chief of the National Guard contained within the state.

The National Guard Organization Act sets forth Congress' intent to maintain and add to the National Guard as necessary to ensure the nation's safety. 32 U.S.C. § 102. The Act restates the right of the federal government to call up members of the National

Guard to active duty.  Id.  Section 104 of the Act lists the President's powers to maintain, organize and mobilize the National Guard.  Critically, section 104(c) provides (emphasis added):

> To secure a force of units of which when combined will form complete higher tactical units, the President may designate the units of the National Guard, by branch of the Army or organization of the Air Force, to be maintained in each State and Territory, Puerto Rico, and the District of Columbia.  ***However, no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor.***

The second highlighted sentence of section 104(c), the proviso, did not appear in the National Defense Act of 1916.  See Rendell, 2005 WL 2050295 at *16.  According to the legislative history of the National Guard Organization Act of 1933, the proviso was added in recognition of state interests.  Id.  The report of the House Committee on Military Affairs stated in part:

> It is the belief of your committee that where a State has gone to considerable expense and trouble in organizing and housing a unit of a branch of the service, that such State should not arbitrarily be compelled to accept a change in the allotment, and this amendment grants to the State concerned the right to approve any such change which may be desired by the Federal Government.

Id. (quoting H.R.Rep. No. 73-141 at 6.)  "In Congress, committee reports are normally considered the authoritative explication of a statute's text and purposes, and busy legislators and their assistants rely on that explication in casting their votes."  Exxon Mobil Corp. v. Allapattah Servs., Inc., — U.S. —, 125 S.Ct. 2611, 2630 (2005).  "The clear intent of Section 104(c) is to protect and

20

delineate the rights and responsibilities of two competing sovereigns, the state and federal governments." <u>Rendell</u>, 2005 WL 2050295 at *17. The proviso explicitly requires the Governor's consent before the federal government may effectuate any change in the branch, organization or allotment of a National Guard unit. Thus, the proviso is fully consistent with the overall purpose of the 1933 Act. <u>See</u> <u>id.</u> at *16. Section 104(c) has been in effect since 1933 and the statute preceded the enactment of the BRAC Act in 1990.

The BRAC Act sets forth requirements, procedures and strict deadlines for closing and realigning military installations. 10 U.S.C. § 2687 note. The Governor contends the recommendation to realign the 118th Airlift Wing is in direct conflict with § 104, and is void ab initio. Although Defendants counter that the BRAC Act supersedes 32 U.S.C. § 104(c) such that they were not required to obtain the Governor's consent to recommend realignment of the 118th Airlift Wing, Defendants fail to provide any legal authority to support their position except to point once again to <u>Dalton</u>. Defendants believe their decisions under the BRAC Act are not reviewable by the federal courts at any time, whether before or after the President acts on the recommendations.

The Court concludes that Defendants' reading of <u>Dalton</u> is too expansive. As the Court has previously explained, <u>Dalton</u> rested on a request under the APA for judicial review of a BRAC Act decision.

Here, the Governor has not sought judicial review under the APA. Rather, the Governor asserts constitutional and statutory claims challenging the Secretary's use of his power to utilize the BRAC Act in accomplishing realignment of aircraft from the 118th Airlift Wing in derogation of the U.S. Constitution and the Governor's statutory power of consent granted to him by Congress under 32 U.S.C. § 104.

The Supreme Court itself acknowledged in <u>Dalton</u> that a claim the President violated a statutory mandate would be judicially reviewable outside the framework of the APA. <u>Dalton</u>, 511 U.S. at 474. In <u>National Fed. of Federal Employees</u>, 905 F.2d at 402-404, the District of Columbia Circuit also recognized that constitutional claims challenging the Secretary's decision to close or realign 145 domestic military bases under the BRAC Act could be adjudicated because such claims were not predicated on the APA.

Moreover, repeal of a statute by implication is not favored, and where two statutes on the same subject exist, the Court bears a duty to regard each statute as effective and to give both statutes their intended effect, if possible. <u>See</u> <u>Rendell</u>, 2005 WL 2050295 at *17. Repeal may be implied only if necessary to make the later enacted statute work, and only then to the minimum extent necessary. <u>Id.</u> (citing <u>Radzanower v. Touche Ross & Co.</u>, 426 U.S. 148, 155 (1976) and cases therein). The Court cannot find an implied repeal unless Congress's intent is clear and manifest. <u>Id.</u>

22

at *19.  In the text of the BRAC Act, "Congress explicitly provided that certain other statutes were repealed or superceded by the BRAC Act . . . However, no language in the text of the BRAC Act expresses an intention to supercede or repeal Section 104(c)." <u>Id.</u> Thus, the Court concludes that the "BRAC Act's silence regarding the changes in the branch, organization or allotment of National Guard units located entirely within a state indicates conclusively that Congress did not intend the BRAC Act to repeal Section 104(c)." <u>Id.</u>

Section 104(c) and the BRAC Act are capable of coexistence because there is not an irreconcilable conflict between the statutes rising to the level of a "positive repugnancy" such that they cannot mutually coexist. <u>Id.</u> at *18.  "The BRAC Act governs the process whereby military bases and other installations are closed or realigned.  It does not, on its face, govern the deactivation or dissolution of units of the National Guard." <u>Id.</u> The subject of § 104(c), however, is the designation and change in branch, structure and allotment of units of the National Guard. <u>Id.</u> at *19.  Thus, the BRAC Act does not cover the whole subject of § 104(c) and "is not clearly intended as a substitute for it." <u>Id.</u>

The BRAC Act "does directly address outplacement of 'civilian employees employed by the Department of Defense at military installations being closed or realigned[.]'" <u>Id.</u> at *18.  But no provision of the BRAC Act prevented the Secretary from seeking

Governor Bredesen's approval before recommending realignment of the 118th Airlift Wing. See id. Under § 104(c), which has not been repealed by implication by the BRAC Act, the Governor possesses federal statutory authority to approve or disapprove any recommendation to change the branch, organization or allotment of the 118th Airlift Wing when it has not been called into active federal service.

The Commission's own General Counsel identified in a legal memorandum addressed to the Commission the legal infirmities in the Secretary's recommendation concerning the transfer of aircraft, but not personnel, from the 118th Airlift Wing. (Docket Entry No. 1, Ex. B.) The General Counsel pointed out that the Secretary's recommendation to move eight aircraft from Nashville, Tennessee, was not a proper use of the BRAC Act, (id. at 7-8 & n.18), and stated: "if these actions are approved by the Commission, the legal authority of the Base Closure Act would be thrown behind these actions, with the likely effect of overriding most if not all existing legal restrictions." (Id. at 8.) One such legal restriction is the Tennessee Governor's statutory right to consent. The Commission's General Counsel continued: "The inclusion of actions that conflict with existing legal authority will endanger the entirety of the base closure and realignment recommendations by exposing the recommendations to rejection by the President or Congress or to a successful legal challenge in the courts." (Id.

24

at 8 & n.20.)  Although the Commission changed the language used, the Commission ultimately adopted the Secretary's recommendation to realign the 118th Airlift Wing without contacting Governor Bredesen to obtain his approval.  This resulting lawsuit and request for injunctive relief is precisely the type of action the Commission's General Counsel predicted would occur if existing federal statutes other than the BRAC Act were not followed.

Thus, the Court can reach no other conclusion than that there is a strong likelihood the Governor will succeed on the merits of his constitutional and statutory claims.

   *2.  Immediate and irreparable harm*

The Court finds the Governor has made a strong showing of immediate and irreparable harm.  The Secretary and the Commission have concluded their work.  They recommend the realignment of eight C130 H2 aircraft and the Aero Medical Evacuation Squadron from the 118th Airlift Wing without first obtaining the Governor's permission to do so, as required by 32 U.S.C. § 104(c).  According to the testimony of Major General Hargett, the Commission's recommendation for the removal of the eight C130 H2 aircraft from the 118th Airlift Wing will result in the loss of hundreds of National Guard positions in the State of Tennessee.

Not only has the realignment decision derogated the statutory rights of the Governor, causing immediate and irreparable harm to his powers as Commander in Chief of the Tennessee Air National

Guard, but the decision, if adopted by the President, will ultimately result in a loss of aircraft and equipment that is critical in dealing with various emergencies within and without the state and the homeland security of the State of Tennessee. This loss of valuable assets and the option to use them are not past injuries, as Defendants contend. The loss represents a present, immediate, and irreparable injury. See Leary, 228 F.3d at 736; Peoples Rights Org., Inc., 152 F.3d at 572.

*3 & 4. The harm to the opposing party and the public interest*

Defendants contend they will suffer irreparable harm if the TRO is granted in that the realignment will be delayed or will not occur and the economic cost savings of $120 million projected over ten (10) years may not be realized. The Court recognizes, as does the Governor, that the purpose of the BRAC Act is to eliminate an unnecessary drain on the economic resources of the Department of Defense. It is a significant consideration in the Court's analysis that federal taxpayers should not be required to support unnecessary or excessive Department of Defense spending.

Yet, the Court is keenly attuned to the public interests of millions of Tennesseans who benefit directly from the presence in the State of the 118th Airlift Wing and the Aero Medical Squadron and the Governor's authority to use these assets in his discretion so long as they are not engaged in federal service. As previously stated, the Tennessee Governor is the Commander in Chief of the

26

Tennessee Air National Guard when that unit is not called into active federal service. Tennessee residents are entitled to expect that federal officials will honor and respect the statutory powers Congress has granted by statute to their Commander in Chief of the State National Guard.

Second, the State stands to lose the protection of the C130 H2 aircraft and hundreds of National Guard personnel who fly, maintain and support the 118th in the event this realignment becomes reality. If a major natural disaster, chemical or biological accident, or terrorist attack occurs, the Governor of the State of Tennessee would lack critical resources to provide immediate relief efforts. Such resources are currently available in the State of Tennessee today and provide the Governor the capability to use these resources to respond to emergencies as he deems appropriate. The necessity of immediate emergency response in the face of disaster has been poignantly brought home to all of us in recent days in light of terrorist bombings and destructive activities, airplane crashes, and natural disasters such as the horrific destruction wrought in several states by Hurricane Katrina. The citizens of the State of Tennessee have an overarching public interest in retaining the resources already allotted to them that outweighs the Defendants' present concern about the loss of economic cost savings in the future.

## IV. CONCLUSION

The Court finds this matter is ripe for adjudication and Governor Bredesen has met all Article III standing requirements. The Court considered the Governor's likelihood of success on the merits of his constitutional and statutory claims, the irreparable injury he faces, the harm imposing injunctive relief would cause to the Defendants, and the public interest. Having considered carefully the arguments of the parties, the Court concludes its balancing of the four Leary factors weighs in favor of the Governor. Therefore, his Motion for a Temporary Restraining Order will be GRANTED.

The Defendants will be temporarily restrained from transmitting a final report to the President of the United States by September 8, 2005, pursuant to the Base Closure and Realignment Act of 1990, as amended, that includes a recommendation to realign the Tennessee Air National Guard 118th Airlift Wing located at the Nashville International Airport Air Guard Station in Nashville, Tennessee, until the Court has ruled on any further motion for preliminary injunctive relief. No security under Federal Rule of Civil Procedure 65(c) will be required.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

28