IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PHIL BREDESEN, Governor of the )
State of Tennessee, )
                                    )    Case No. 3:05-00640
        *Plaintiff,*          )    Judge Nixon
                                    )    Magistrate Judge Brown
v.                                   )
                                    )
DONALD H. RUMSFELD,[1] Secretary of )
Defense, )
                                    )
        *Defendant.*           )

## ORDER

Pending before the Court are Plaintiff's, Governor of Tennessee Phil Bredesen ("Plaintiff" or "Governor"), Motion for Summary Judgment (Doc. No. 64), and Defendant's, Secretary of Defense Donald H. Rumsfeld ("Defendant" or "Secretary"), Motion to Dismiss (Doc. No. 61). Plaintiff has filed a Response in Opposition to Defendant's Motion to Dismiss (Doc. No. 68), and Defendant has filed a Combined Reply in Support of Defendant's Motion to Dismiss and Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 72). Finally, Plaintiff has also filed a Reply in Support of Motion for Summary Judgment (Doc. No. 74).

---

[1] Donald Rumsfeld resigned as Secretary of Defense on December 18, 2006, and Robert Gates was sworn in as his successor. As neither party has filed any motions indicating otherwise, the action continues with the current Secretary named as Defendant.

-1-

## I. BACKGROUND

### A. Procedural Background

Plaintiff initially filed this Complaint (Doc. No. 1) on August 18, 2005, seeking a declaratory judgment declaring that the Secretary may not, under the authority of the Defense Base Closure and Realignment Act of 1990 ("BRAC" or "BRAC Act"), realign the Tennessee Air National Guard's 118th Airlift Wing ("118th Airlift Wing") without seeking the approval of the Governor. Plaintiff alleges that in realigning the base without the approval of the Governor, the Secretary violates rights granted by the United States Congress ("Congress") to the Governor independent of the BRAC Act, and that it will violate Article 1, Section 8 of the United States Constitution ("Constitution"), as well as the Second Amendment to the Constitution.

### B. Statutory Background

In 2001, Congress adopted a process to identify military installation within the United States that could be closed or realigned in an effort to save federal tax dollars. National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, Div. B, Title XXX, §§ 3001-3008, 115 Stat. 1012 (2001) (codified at 10 U.S.C. § 2687). Utilization of such a process was not a new idea, as Congress, United States Presidents, and the United States Department of Defense had previously engaged in rounds of military base closures and realignments in 1991, 1993, and 1995. To proceed for an additional round of base closures and realignments in 2005, Congress amended the BRAC Act of 1990, Public Law No. 101-510, 10 U.S.C. § 2687 note, §§ 2909-2914, to establish the method by which such base closures and realignments would take place.

In the first step of this process, Congress directed the Secretary of Defense to provide a force-structure plan for the Armed Forces for the twenty-year period between 2005 and 2025.

Congress instructed the Secretary to include in the force-structure plan the probable threats to the national security within the designated time period, the probable end-strength levels and major military force units (including land force divisions, carrier and other major combatant vessels, air wings, and other comparable units) needed to meet the probable threats, and the anticipated levels of funding that will be available for national defense during that period. 10 U.S.C § 2687 note, § 2912(a)(1)(A). Congress further directed the Secretary to provide a comprehensive inventory of military installations world-wide for each military department, with specifications of the number and type of facilities in the active and reserve forces for each military department. Id. § 2912(a)(1)(B).

Using the force-structure plan and the infrastructure inventory, the Secretary was to provide a description of the infrastructure necessary to support the force-structure plan, a discussion of categories of excess infrastructure and infrastructure capacity, and an economic analysis of the effect of the closure or realignment of military installations to reduce excess infrastructure. Id. § 2912(a)(2). Congress provided for revision of the force-structure plan, but directed the Secretary to submit any such revised plan to Congress no later than March 15, 2005. Id. § 2912(a)(4).

In determining the level of necessary, as opposed to excess, infrastructure, Congress instructed the Secretary to evaluate two special considerations: (1) the anticipated continuing need for and availability of military installations outside the United States, taking into account current and potential restrictions on the use of such installations; and (2) any efficiencies that may be gained from joint tenancy by more than one branch of the Armed Forces at a miliary installation. Id. § 2912(a)(3).

Based on the force-structure plan, the infrastructure inventory, and the economic analysis, the Secretary was to certify whether the need existed for the closure or realignment of additional military installations, and further certify that such closures or realignments would result in annual net savings for each of the military departments, beginning no later than fiscal year 2011. Id. § 2912(b).

The BRAC Act does not expressly address Air National Guard units, the dual state and federal status of National Guard units, or the authority previously given by Congress to the state governor in 32 U.S.C. § 104 (c) to consent to any change in the branch, organization, or allotment of a National Guard unit located entirely within a state.[2] The parties have not directed the Court to any legislative history indicating that Congress considered the interplay between 32 U.S.C. § 104 (c) and the BRAC Act, as amended.

The Secretary announced the current base closure and realignment recommendations on May 13, 2005. The list included 190 separate recommendations that ultimately produced as many as 837 district closure or realignment actions. Id. § 2914(a). The BRAC Commission approved 119 of the Secretary's 190 recommendations with no change and accepted another forty-five with amendments. The Commission rejected thirteen recommendations in their entirety and significantly modified another thirteen. Id.

---

[2] 32 U.S.C. § 104 (c) reads: "To secure a force the units of which when combined will form complete higher tactical units, the President may designate the units of the National Guard, by branch of the Army or organization of the Air Force, to be maintained in each State, the Commonwealth of Puerto Rico, the District of Columbia, Guam and the Virgin Islands. However, no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor."

## C. Factual Background

This case arose out of the Secretary's May 13, 2005 recommendation that the BRAC Commission realign the 118th Airlift Wing and relocate the C130 aircraft to different Air National Guard Units based in Louisville, Kentucky ("Louisville") and Peoria, Illinois ("Peoria"). The 118th Airlift Wing is an operational flying National Guard Unit located entirely within the State of Tennessee ("Tennessee" or "State") at the International Airport Air Guard Station in Nashville, Tennessee. It is a component of the Air Reserve Corp and has over 1,200 military positions, including sixty-five Active Guard and Reserve personnel, 226 military technicians, and 936 part-time guard members. The 118th Airlift currently has a total of eight aircraft, all of which are model C130. According to a hearing held on September 2, 2005, the loss of the aircraft will likely affect the duties and mission of approximately 700 of the employees of the 118th Airlift Wing, particularly those who hold operation positions, including pilot and maintenance positions. (Doc. 67 at 6). The 118th Airlift Wing is a well-trained, mission ready military force that has been available to the Governor to perform State Active Duty Missions on issues ranging from homeland security to national disasters.

Plaintiff argues that the 118th Airlift Wing plays a key role in disaster and emergency response and recovery in Tennessee, including assistance with major disasters, such as tornadoes, floods and earthquakes. (Doc. No. 67 at 8). Further, the Aero Medical Evacuation Squadron of the 118th Airlift Wing comprises the only deployable medical capability in the Tennessee National Guard, and according to the Hargett Declaration, (Doc. No. 67 at 9), removal of the C130 aircraft would deprive the State of the ability to use this versatile medical unit.

On September 8, 2005, the BRAC Commission transmitted a report to President George

W. Bush ("the President"), containing its recommendation to relocate the C130 aircraft from the 118th Airlift Wing to the Air National Guard Units in Louisville and Peoria. The President accepted this recommendation on September 15, 2005. 10 U.S.C. § 2687 note, § 2914(e).

At no time during the BRAC process did the Secretary or any other Department of Defense representative request or obtain the approval of the Governor to change the branch, organization or allotment of the 118th Airlift Wing, and the Governor has never provided his approval for such realignment. The Governor informed the Secretary that he did not consent to the deactivation, realignment, relocation or withdrawal of the 118th Airlift Wing. (Doc. No. 56 at 7).

On October 27, 2005, pursuant to § 2908(d) of the BRAC Act, debate began in the United States House of Representatives ("House of Representatives") on a joint resolution to disapprove of the recommendations of the BRAC Commission. H.R.J. Res. 65, 109th Cong., 151 Cong. Rec. H9289-01(2005). Congressional representatives argued both in favor of, and in opposition to, the resolution, as well as those who expressed reservations about the BRAC process. However, despite statements in defense of state governors' right to consent to realignment of Air National Guard unit in their states, the House of Representatives approved the BRAC report by a vote of 324-85. 151 Cong. Rec. D1108-01 (2005).

According to the BRAC Act, the Secretary shall now close all military installations recommended for closure and realign all military installations recommended for realignment. 10 U.S.C. § 2687 note, § 2904. Through a sunset provision, the BRAC Act expired on April 15, 2006. Id. § 2909(a).

## II. CLAIMS AND DEFENSES

The Governor has five claims, as outlined in the Complaint. (Doc. No. 1). His first claim is that the Secretary exceeded his statutory authority under the BRAC Act by inappropriately using the BRAC Act as a basis to: (a) move aircraft from the Tennessee National Guard to a unit of the National Guard in another state, (b) determine how a National Guard unit is equipped or organized, and (c) relocate, withdraw, disband or change the organization of the Tennessee National Guard. (Doc. No. 1 at 9). The Governor's second claim is that the Secretary has violated 32 U.S.C. § 104 by realigning the 118th Airlift Wing without first obtaining the approval of the Governor. Id. at 10. The Governor's third claim is that the Secretary has violated 10 U.S.C. § 18239 by realigning the 118th Airlift Wing without first obtaining the consent of the Governor. Id. at 11. The Governor's fourth claim is that the Secretary has violated 10 U.S.C. § 18235(b)(1) by realigning the 118th Airlift Wing in such a way as would result in interference with the use of the Nashville International Airport Air Guard Station for training and administering reserve components of the armed forces. Id. Finally, the Governor claims that the Secretary has violated Art. 1, § 8 and Amendment II of the Constitution by interfering with the maintenance and training of the Tennessee National Guard, without the approval of the Governor. Id. at 12.

In response, the Secretary argues that the Governor's claims should be dismissed for a lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(1) because Congress demonstrated a "clear intent to preclude judicial review of the Secretary's implementation of the closures and realignments." (Doc. No. 61 at 4). Further, the Secretary argues, as a basis for dismissal, that the Governor fails to state a claim upon which relief can be

granted, pursuant to FRCP 12(b)(6). Finally, he argues that even if the Governor has a valid cause of action, his claim nonetheless would fail on the merits.

### III.  PENDING MOTIONS

Defendant now files a Motion to Dismiss (Doc. No. 61), pursuant to FRCP 12(b)(1) and 12(b)(6), arguing that: (1) the Court lacks jurisdiction to hear the Governor's claims because Congress's intent to preclude judicial review is clear not only from the legislative history, but also, from the carefully considered statutory scheme and overarching purpose of the BRAC Act, as well as Congress's acquiescence in Dalton v. Spector, 511 U.S. 462 (1994); (2) the Governor's claims present non-justiciable political questions; (3) even if the claims are justiciable and this Court has jurisdiction, the Governor has not identified a proper cause of action for his claim under 32 U.S.C.§ 104(c); (4) the gubernatorial consent requirement in 32 U.S.C. 104(c) would be in clear conflict with the express text of the BRAC Act; (5) the Militia Clauses of the Constitution have not been violated; and (6) the Second Amendment has not been violated.

The Governor moves separately for summary judgment (Doc. No. 65), arguing that the Secretary is prohibited from making any change to the branch, organization or allotment of the 118th Airlift Wing without the approval of the Governor under 32 U.S.C. 104(c), and that the Secretary's proposed construction of the BRAC Act to allow the realignment of the 118th Airlift Wing is unconstitutional. The Governor also responds to the Secretary's claims for dismissal, arguing that the Court does have subject matter jurisdiction over Plaintiff's constitutional and federal law claims, and that the Plaintiff has a claim upon which relief can be granted.

This Court will first consider the issues in the Secretary's Motion to Dismiss because if

the Motion to Dismiss is granted, then Plaintiff's Motion for Summary Judgment is rendered moot.

## IV. LEGAL STANDARDS

Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1) of the FRCP, the plaintiff bears the burden of proving that the Court has jurisdiction. Moir v. Greater Cleveland Reg'l Transit Auth., 896 F.2d 266, 269 (6th Cir. 1990). When subject matter jurisdiction is challenged on the face of the complaint, a plaintiff is entitled to all reasonable factual inferences. Ohio Nat'l Life Ins. Co. v. U.S., 922 F.2d 320, 325 (6th Cir. 1990). However, 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, are treated differently. See RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1134 (6th Cir. 1996). "Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction-its very power to hear the case-there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. (quoting Mortensen v. First Fed. Sav. & Loan Ass'n., 549 F.2d 884, 890 (3d Cir. 1977)). In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction. Nichols v. Muskingum Coll., 318 F.3d 674, 677 (6th Cir. 2003).

A motion to dismiss under Rule 12(b)(6) of the FRCP "tests whether a cognizable claim has been pleaded in the complaint." Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988). In considering a motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's factual allegations are accepted as true. See Wallin v. Norman,

317 F.3d 558, 561 (6th Cir. 2003). A motion to dismiss for failure to state a claim upon which relief can be granted must be viewed in the light most favorable to the non-moving party. See id. "In order for a dismissal to be proper, it must appear beyond doubt that the plaintiff would not be able to recover under any set of facts that could be presented consistent with the allegations of the complaint." Bower v. Fed. Express Corp., 96 F.3d 200, 203 (6th Cir. 1996).

V. DISCUSSION

    A. Defendant's Claims for Dismissal

        1. The Court lacks jurisdiction to enjoin the implementation of the Commission's Recommendation because the statutory scheme, overarching purpose, and history of the BRAC Act Demonstrate Congress's Intent to Preclude Judicial Review.

The Secretary's first claim is that the Governor's claims are not justiciable because the Court lacks subject matter jurisdiction. The Secretary argues that Congress, through the BRAC Act, has precluded judicial review of the Secretary's implementation of the BRAC recommendations. Therefore, the Court cannot grant the relief that the Plaintiff requests and must dismiss the case pursuant to FRCP 12(h)(3), which states that "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."[3] The Governor asserts that subject matter jurisdiction in this case is rooted in 28 U.S.C. § 1331, which states that federal district courts have jurisdiction "of all civil actions arising under the Constitution, laws or treaties of the United States."

---

[3] Defendant later states in his Reply Brief (Doc. No. 72) that this argument is limited to the Court's jurisdiction over Plaintiff's statutory claims, not his constitutional claims. (Doc. No. 72 at 5). The Court finds that the Secretary was disingenuous in not making this admission in Defendant's initial Motion to Dismiss, and in implying that the entire matter could be dismissed based on Congress's intention to preclude judicial review. Nonetheless, the Court will address Defendant's arguments in their entirety.

-10-

There are certain cases where federal question jurisdiction may be precluded by Congress. Califano v. Sanders, 430 U.S. 99, 105 (1977). While there is always a strong presumption in favor of judicial review, this may be overcome by specific language to the contrary, Block v. Community Nutrition Institute, 467 U.S. 340, 349 (1984), or if there is a "persuasive reason" to believe that Congress intended to preclude such review. Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986) (citing ABBOTT Lab. v. Garner, 387 U.S. 136, 140 (1967)).

The question of whether the preclusion of judicial review was intended by Congress in composing the BRAC Act has been examined by courts in the past, with conflicting results. For example, the Second Circuit, in denying a preliminary injunction against the BRAC Commission in Connecticut, stated that in the future "the State of Connecticut may have an opportunity to contest the removal of the aircraft when indeed the action becomes final . . . At that stage, the state may argue that the Commission acted in violation of 32 U.S.C. § 104(c)." Rell v. Rumsfeld, 423 F.3d 164, 165-166 (2d Cir. 2005). While the Second Circuit implied that judicial review may be available for this type of case, the court did not analyze or explain its conclusion that there would be jurisdiction at that time.

In contrast, the Western District of Washington completed a thorough analysis of the issue and held that Congress intended to preclude judicial review of actions taken under BRAC. Gregoire v. Rumsfeld, 463 F.Supp.2d 1209, 1222-223 (W.D. Wash. 2006). Similarly, in Corzine v. 2005 Defense Base Closure & Realignment Commission., 388 F.Supp.2d 466 (D.N.J. 2005), the court in the District of New Jersey found that the court lacked subject matter jurisdiction to grant injunctive relief to bar the BRAC Commission from forwarding its recommendation to the

-11-

President to close a military base in New Jersey.

However, the most persuasive case which examined this matter is Dalton v. Specter, 511 U.S. 462 (1994). In that case, the plaintiffs were seeking to enjoin the Department of Defense from closing the Philadelphia Naval Shipyard, as decided pursuant to the BRAC Act. The majority held that the actions by the Secretary and the Commission, in recommending base closure, were not subject to judicial review under the Administrative Procedure Act ("APA"), specifically because they were not final agency actions, and because the President is not an "agency," under the APA. While this holding does not have a direct impact on the case at hand, Justice Souter, joined by Justices Blackmun, Ginsburg and Stevens, concluded in a concurring opinion, that the "text, structure, and purpose of the [BRAC] Act compel the conclusion that judicial review of the Commission's or the Secretary's compliance with it is precluded." Id. at 479. While this Court is not bound by this concurring opinion, it is highly persuasive in the matter at hand.

Justice Souter focuses on the text of the BRAC Act, its particular statutory scheme, and the fact that it explicitly permits judicial review for only one type of claim (claims under the National Environmental Policy Act of 1969 ("NEPA")) before concluding that these factors can be "understood no other way" than to preclude judicial review. Id. at 484. These factors, and others highlighted by the Secretary in his Motion to Dismiss, are outlined below. The Court finds that these factors, when viewed collectively, lead to the conclusion that Congress intended to preclude judicial review here.

### a. *BRAC's Purpose and Structure*

At the time the BRAC Act was adopted, Congress was familiar with the unsuccessful, efforts to close military bases in a timely manner. See H.R. Rep. 101-923, at 705 (1990) (Conf. Rep.). In the 1990 Conference Report, the House of Representatives contrasted the then current process with the new process under BRAC, stating that previously, closures and realignments "[took] a considerable period of time and involve[d] numerous opportunities for challenges in court." Id. In contrast, the BRAC process would "permit base closures to go forward in a prompt and rational manner." Id. The BRAC Act's text reflected this congressional intent in its intricate structure allowing a base-closing package to be quick and final.

Similarly, in his concurrence in Dalton, Justice Souter specifically cites the fact that the schedule for the recommendations and base closings, requiring prompt implementation, as evidence that Congress did not intend for the decision to be subject to litigation during the process. Dalton, 511 U.S. 462 at 481. Justice Souter argues that the fact that Congress determined it would disband biennially, and at the end of three rounds of base-closing decisions it would terminate, further demonstrates Congress's intent to preclude judicial review. Id. "If Congress intended musical review of individual base-closing decisions, it would be odd indeed to disband biennially, and at the end of three rounds to terminate, the only entity authorized to provide further review and recommendations." Id. A similar finding was made in Corzine, in which the District Court in New Jersey found that, "the current version of BRAC maintains the rigid step-by-step time schedule, temporary nature of the Commission, requirement for prompt implementation, and inability of the President and Congress to pick and choose parts of the recommendations to approve and disapprove. All of these elements reinforce the conclusion that

-13-

BRAC does not provide for judicial review here." Corzine, 388 F. Supp.2d at 451.

A second feature of the BRAC Act that indicates congressional intent to preclude judicial review is the "all-or-nothing" feature of this statutory scheme. The BRAC Act entails that "[t]he President and Congress must accept or reject the biennial base-closing recommendations as a single package." Dalton, 511 U.S. 462 at 481 (citing 10 U.S.C. § 2687 note, §§ 2903(e)(2), (e)(3), and (e)(4) (as to the President) and §§ 2908(a)(2) and (d)(2) (as to Congress)). Therefore, as Justice Souter argues, the base closures were intended to take place as a package and the idea that any one closure could be subject to judicial review does not make sense within the overall scheme. "If judicial review could eliminate one base from a package, the political resolution embodied in that package would be destroyed; if such review could eliminate an entire package . . . the political resolution necessary to agree on the succeeding package would be rendered more difficult, if not impossible." Dalton, 511 U.S. at 482. Thus, it would have been nonsensical to allow states to be able to bring a lawsuit in order to alter Congress's recommendations after constructing such a scheme.

Justice Souter highlights two other aspects of the scheme that demonstrate that Congress did not likely intend for judicial review of this action under BRAC. First, he notes that the BRAC Act does provide for other non-judicial solutions "to assess any procedural (or other) irregularities." Id. Second, the BRAC Act specifically allows for judicial review of certain types of objections, namely those brought under the NEPA, 83 Stat. 852, as amended, 42 U.S.C. § 4321 *et seq.* Dalton, 511 U.S. at 483. "This express provision for judicial review of certain NEPA claims within a narrow time frame supports the conclusion that the [BRAC] Act precludes judicial review of other matters, not simply because the [BRAC] Act fails to provide expressly

-14-

Case 3:05-cv-00640  Document 79  Filed 06/26/07  Page 14 of 20 PageID #: 730

for such review, but because Congress surely would have prescribed similar time limits to preserve its considered schedules if review of other claims had been intended." Id. The current version of BRAC maintains the rigid step-by-step time schedule, temporary nature of the Commission, requirement for prompt implementation, and inability of the President and Congress to pick and choose parts of the recommendations to approve and disapprove.

### b. *Legislative History*

A presumption of judicial review may be overcome by "specific legislative history that is a reliable indicator of congressional intent." Block, 467 U.S. 340 at 350. In examining the legislative history surrounding the BRAC Act, the Secretary points to a 1990 House of Representatives Conference Report stating that, "[s]pecific actions which would not be subject to judicial review include . . . the Secretary's actions to carry out the recommendations of the Committee under sections 2904 and 2905." H.R. Rep. No. 101-923, at 706 (1990) (Conf. Rep.). Thus, the legislative history indicates congressional intent to preclude judicial review.

The Governor replies that Congress has only expressed a desire to preclude judicial review under the APA, but has not precluded the same review of the issue of whether the Secretary has acted within his statutory authority, or to review his actions for constitutional violations. (Doc. No. 68 at 12). The Court does not consider this to be a sufficient response to the Conference Report noted above.

### c. *Opportunity for Congress to Review*

The Secretary argues that Congress had the opportunity to address the question of judicial review after the publication of the Dalton decision in 1994. According to the Secretary, not only did Dalton preclude judicial review of BRAC decisions under the APA, but Justice Souter's

-15-

concurrence presented the argument that Congress intended for judicial review to be precluded for all of the plaintiff's claims in that case. And yet, Congress has taken no action to clarify its intention with BRAC since the Dalton decision was announced, despite the fact that Congress amended the BRAC Act in 2001 and 2004 with substantive changes. The Secretary further suggests that Congress's silence on the topic of judicial review when it made these changes to the BRAC Act indicates their intent to preclude judicial review entirely, in accordance with Justice Souter's concurrence. As such he argues that the Court may infer an intent to preclude judicial review based on Congress's failure to address specifically the issue of judicial review following Dalton.

The Governor's primary objection to the argument that Congress intended for judicial review to be precluded is that to preclude all judicial review of BRAC decisions would lead to "an inane result never intended by Congress." (Doc. No. 68 at 13). Specifically, he argues that it would keep the judiciary from being able to address a claim for a violation of the Equal Protection Clause in the application of BRAC.

After review, the Court finds that, indeed, Congress may not restrict jurisdiction in such a way that impedes due process by blocking constitutional claims. However, violations of such constitutional rights are outside of the scope of this opinion. Here, the Governor's claims are primarily statutory. His sole constitutional claim is limited to an alleged violation of Article 1, Section 8 of the Constitution, and to a violation of the Second Amendment to the Constitution. These claims will be addressed in the subsequent section below.

In sum, the Court holds that Plaintiff's statutory claims must be dismissed for lack of jurisdiction because the Court finds that Congress intended to preclude judicial review of actions

-16-

taken under BRAC. The Court bases this finding on the purpose and structure of the BRAC Act, including the rigid step-by-step time schedule, temporary nature of the Commission, requirement for prompt implementation, and all-or-nothing aspect of BRAC. In addition, the legislative history of the BRAC Act and Congress's failure to address the issue of judicial review in light of the Dalton decision, despite making significant changes to BRAC in 2001 and 2004, reinforce the conclusion that BRAC does not provide for judicial review here.

### 2. Plaintiff's Constitutional Claims Present Non-justiciable Political Questions.

The Secretary further argues that all of the Governor's claims are precluded from judicial review because they are non-justiciable political questions, and, as such, must be resolved by the Executive or Congressional branches. However, the Court finds it is well-settled that the political question doctrine applies only to constitutional questions, not to questions of statutory violations. "[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986). As noted in the section above, federal courts are presumed to have jurisdiction over statutory questions, with the exception of statutes in which Congress precludes judicial review. As such, this section will only address the Governor's constitutional claims, specifically his claim of the Secretary's alleged violation of Article I, Section 8 of the Constitution, and the Second Amendment to the Constitution.

Determining whether a case presents a non-justiciable political question is not an inquiry into the constitutionality of the actions in question, but rather, a finding that another branch of government is more properly suited to make such a determination. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices

-17-

and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions." Japan Whaling Ass'n, 478 U.S. 221 at 230. At the same time, the courts must differentiate between political questions that courts are precluded from addressing, and those with simply "significant political overtones," which courts may address. Id. The United States Supreme Court, in Baker v. Carr, 369 U.S. 186 (1962), identified a list of relevant factors to consider in determining whether a case presents a non-justiciable political question. The Baker test has been further clarified as consisting of "three inquiries: (i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?" Goldwater v. Carter, 444 U.S. 996, 998 (1979) (Brennan, J., concurring).

The Secretary presents two reasons why the matter at issue should fall within the political question doctrine. First, he argues that decisions regarding the "raising, supporting, and allocating [of] the Nation's military forces are textually entrusted by the Constitution to the political branches," citing Article I and II of the Constitution, which state that the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." (Doc. No. 61 at 24, citing U.S. Const. Art. I, § 8, cl. 16).

The Court finds that Plaintiff's allegations fall within the first Baker element above. When the Constitution expressly allocates a power to the Executive and Legislative branches of

government, there is no role for judicial review. See Goldwater 444 U.S. at 1002-04 (Rehnquist, J., concurring). Thus, it follows that since BRAC deals with the allocation of the military, an issue which the Constitution specifically designated to the Legislature, the Judiciary has no role in reviewing these decisions.

Second, the Secretary argues that in Gilligan v. Morgan, 413 U.S. 1 (1973), a case in which the plaintiffs challenged the inadequate training of members of the National Guard, the United States Supreme Court held that judicial evaluation of "decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability." Id. at 10. Nonetheless, the Court also noted that "it should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review." Id. at 11.

In response, Plaintiff argues that this case is not one in which the Court is being asked to make a decision about military forces specifically, or to mediate a dispute between the Executive and Legislative branches. Therefore, Plaintiff contends that Defendant's argument, that Plaintiff's claims present non-justiciable political questions, does not apply here.

The Court rejects Plaintiff's assertion and finds that Plaintiff's claims involve political questions. In Plaintiff's own Motion for Summary Judgment, the Governor asserts that the realignment of the aircraft in this case will "adversely impact the ability of the State of Tennessee and its Governor to properly train the 118th Airlift Wing Aviation Components according to discipline prescribed by Congress." (Doc. No. 65 at 20-21). In reviewing Plaintiff's arguments,

it is impossible to ignore that they note the impact of the realignment on the composition, training, equipping, and control of a military force. (See, e.g., Doc. No. 65 at 21). Thus, the Court must conclude that Plaintiff's constitutional claims are barred by the political question doctrine.

### B. Plaintiff's Claims on the Merits

It is not necessary for the Court to address Plaintiff's claims on the merits, articulated in its Motion for Summary Judgment (Doc. No. 64), because the case must be dismissed based on this Court's lack of jurisdiction over the claims.

## VI. CONCLUSION

As set forth above, the Court holds that Plaintiff's statutory claims must be dismissed for lack of jurisdiction, and Plaintiff's constitutional claims must be dismissed under the political question doctrine. Accordingly, Defendant's Motion to Dismiss is **GRANTED**. The Court, therefore, does not need to reach a decision on the merits of Plaintiff's Motion for Summary Judgment, as it is rendered moot by the Court's dismissal of the case. Thus, Plaintiff's Motion for Summary Judgment is **DENIED** as moot. The Court hereby **DISMISSES** the above-captioned case in its entirety.

It is so ORDERED.

Entered this the _____ day of _____, 2007.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT